**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **BANKOLE OGUNBAMISE,** | |
| **Plaintiff,** | |
| **v.** | **1:07-CV-2004-WSD** |
| **WELLSTAR HEALTH SYSTEM, INC.,** | |
| **Defendant.** | |

## OPINION AND ORDER

Plaintiff Bankole Ogunbamise ("Plaintiff"), who appears <u>pro se</u>, claims age-based discrimination and retaliation by his former employer the Wellstar Health System, Inc. ("Defendant").[1]  Plaintiff was 67 years old when Defendant terminated his employment.  The matter is before the Court on the Defendant's Motion for Summary Judgment [62].  Because Plaintiff has not stated a *prima facie* case of age discrimination or retaliation, and because Plaintiff has not

---

[1] Plaintiff's complaint incorrectly refers to Defendant as Wellstar Cobb Hospital.  The Court refers to the appropriate legal entity, the Wellstar Health System, as the Defendant in this matter, and, to the extent Plaintiff refers to Wellstar Cobb Hospital, it is understood Plaintiff is also referring to the Wellstar Health System.

otherwise successfully rebutted the Defendant's legitimate nondiscriminatory

reason for terminating him, the Court grants summary judgment to the Defendant.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

The Court presents the factual background of this case in the light most-

favorable to the Plaintiff.  The Court also accords Plaintiff deference and construes

his filings liberally in light of his pro se status.  GJR Invs., Inc. v. County of

Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998) ("Courts do and should show

a leniency to pro se litigants not enjoyed by those with the benefit of a legal

---

[2]  The Court draws its factual background from the Defendant's Statement of
Undisputed Material Facts ("SUMF") [62] and from Plaintiff's Response to the
Defendant's Statement of "Material Facts" [72].  The Court's Local Rules require
movants for summary judgment to submit with their motion a concise,
individually-numbered set of material facts to which the movant contends there is
no genuine issue to be tried.  LR 56.1B(1), NDGa.  The respondent on a summary
judgment motion is required to file a response to the movant's statement of
undisputed material facts, in concise numbered fashion and refuting or admitting
each of the numbered facts.  Id. LR 56.1B(2)(a)(1).  The movant's facts shall be
deemed admitted unless the respondent directly refutes the movant's fact with
concise responses supported by specific citations to evidence (including page or
paragraph number), states a valid objection to the admissibility of the movant's
fact, or points out that the movant's citation does not support the movant's fact or
that the movant's fact is not material or otherwise has failed to comply with the
provisions set out in the Local Rules.  LR 56.1B(2)(a)(2); Richardson v. Jackson,
545 F. Supp. 2d 1318, 1321 (N.D. Ga. 2008).  Several of the facts are not disputed
by Plaintiff, and the Court notes throughout where the parties appear to have actual
factual disputes, many of which are not material.

education."). Yet even in <u>pro se</u> cases, the Court is not permitted to serve as de facto counsel to a party or to rewrite an otherwise deficient pleading. <u>Id.</u> The Court does not accept factual averments completely unsupported by the record.[3]

Defendant operates a number of hospitals and other health care facilities in the Atlanta area, including Cobb Hospital. SUMF ¶ 1. On September 26, 2006, Plaintiff applied for a job as a Nurse Care Associate ("NCA") with Cobb Hospital. Pl.'s Resp. to Scott Decl. [71] at 2. In October 2006, personnel from Defendant interviewed Plaintiff in person for the NCA position. <u>Id.</u> at 3. Defendant hired Plaintiff effective as of November 6, 2006, and Plaintiff began working the nighttime shift from 7:00 p.m. to 7:00 a.m. Lindy Scott, a Nurse Manager at Cobb Hospital, supervised Plaintiff. <u>Id.</u> Scott met with Plaintiff in person before he was hired for the night shift. SUMF ¶ 11.

Plaintiff was born in November 1939. He is originally from Nigeria, where, in 1967, he earned an MBBS, apparently the Nigerian equivalent of an American M.D. Pl.'s Dep. at 8. Plaintiff also earned a master's degree in public health from

---

[3] The factual record in this case is limited. The majority of Plaintiff's arguments are supported by factual averments without evidentiary or logical, support, and Plaintiff's version of the facts often relies on incredible scenarios or conclusions. The Court has attempted to give Plaintiff deference and construe his allegations leniently, except where they are clearly contradicted by the record.

Johns Hopkins University in 1969.  Id.  Plaintiff alleges to be qualified to practice

medicine anywhere in Africa.  Id.  At the time Plaintiff applied for employment

with Cobb Hospital, he was working as a security officer for U.S. Security.  Id. at

9.  Plaintiff decided to leave his position at U.S. Security because he believed he

was being poisoned on the job.  Id. at 11; SUMF ¶ 3.  Plaintiff sought treatment for

the "poisoning" at the Centers for Disease Control ("CDC"), treatment which

Plaintiff alleges was denied because the CDC does not treat private cases.  SUMF ¶

3.  Plaintiff treated himself for his poisoning condition.  Pl.'s Dep. at 12.

Plaintiff believes he was poisoned by officials at U.S. Security at the

direction of a secret organization that has arrayed its forces against him and his

interests.  SUMF ¶¶ 4-6; Pl.'s Dep at 12-13, 45-48.  Plaintiff also believes this

"secret society" prevented him from retaining an attorney in this action and that the

society is capable of controlling his employers, including Defendant.  Id.  Plaintiff

believes the secret organization effectively runs the United States.  Pl.'s Dep. at 87.

Plaintiff believes the secret society began meddling in his affairs during divorce

proceedings involving his first wife, who allegedly was a member of the secret

society.  SUMF ¶ 7; Id. at 88.

Plaintiff began working as a NCA in November 2006. His duties included assisting patients with daily life activities, helping patients feed and bathe, taking vital signs, and drawing blood. SUMF ¶ 12. At the time of Plaintiff's employment, Scott, who was born in 1957, supervised several other employees older than 40 years old, including Paula Ducasse (born 1954), Kathryn Barber (born 1956) and Barbara Middleton (born 1946). SUMF ¶ 10.

During the first few weeks of Plaintiff's employment, Scott began to develop concerns regarding Plaintiff's work performance, including his slow pace of work and attitude towards other employees. SUMF ¶ 13.[4] Scott allegedly received complaints from other night shift employees regarding Plaintiff's interactions with them. Id. ¶ 14. Plaintiff alleges to have suffered several

---

[4] Plaintiff disputes this assertion as a gross misinterpretation of the facts. Pl.'s Resp. to SUMF ¶ 13. Plaintiff's dispute is unsupported by evidence. Plaintiff's dispute consists mainly of argument and conjecture about why he performed at a slow pace on particular days. The Court's Local Rules require respondents to summary judgment motions to support their objections to the movant's alleged "undisputed" facts with citations to record evidence. LR 56.1B(2)(a)(2), NDGa. Plaintiff's Exhibit 7 is a "Situation Report" written by Plaintiff dated January 5, 2007 and allegedly given to Scott. The document explains why Plaintiff was slow in performing his job duties during a shift beginning January 3rd or 4th. Plaintiff contends this supports his dispute. Pl.'s Exh. 7. This document also is consistent with Defendant's version of the facts, which state that Scott counseled Plaintiff about his slow pace of work.

administrative problems early in his employment. These difficulties included receipt of the wrong gate pass for the hospital's parking area, clerical errors on his letter of appointment, mistakes in Plaintiff's computerized personnel file mistakenly entering his year of birth as "2039" instead of 1939, and misclassification in the hospital's computer system as a Registered Nurse instead of a NCA. Pl.'s Resp. to Def.'s Mot. for Summ. J. [73] at 3-4.[5] Plaintiff alleges these administrative problems hampered his ability to work efficiently and caused him to miss a sign-up deadline for health insurance. Plaintiff also believes these initial administrative problems were part of the pattern of discrimination instigated against him by the Defendant.

On January 4, 2007, Scott met with Plaintiff to discuss her concerns about his performance, comments from other employees, and his staying past the end of his shift. SUMF ¶ 16.[6] Scott documented this meeting with an "Employee

---

[5] Defendant does not dispute that these administrative errors were made and eventually corrected.

[6] Plaintiff repeatedly disputes the date of this meeting. He believes it took place on the morning of January 5, 2007. Pl.'s Resp. to SUMF ¶ 16. This dispute is not material. Plaintiff does not dispute that a meeting took place and that problematic aspects of his performance were discussed. Id. Whether this verbal warning took place on January 4th or January 5th is not material to this action. The Court also notes that Plaintiff's Exhibit 80 indicates that he worked shifts

Conference / Counseling Report" placed in Plaintiff's file. Scott Decl. Exh. 1. According to the counseling report, Scott verbally notified Plaintiff that other employees were complaining about his performance. Id. Plaintiff also was informed that he needed to show improvement in the next few weeks and that the patient load for all NCAs would be increasing the following month. Id. Plaintiff does not dispute that this meeting occurred or that he stayed past the end of a shift, although he attributes that delay to the presence of a doctor in his patient's room. Scott gave a copy of the counseling report to Plaintiff. SUMF ¶ 26.

Following the meeting with Scott, Cobb Hospital increased the number of patients assigned to each NCA on a given shift. SUMF ¶ 19. This increase was the result of a decision to take several NCAs off the hospital floor, and it created a need for all NCAs to work more efficiently. Id. ¶ 23.

---

beginning in the evenings of both January 3, 2007 and January 4, 2007. Pl.'s Exh. 80. It is conceivable Scott could have met with Plaintiff in the morning following either shift, and the exact date and time is not material to this dispute.

Plaintiff claims that sometime during the month of January 2007,[7] he asked Scott: "Excuse me, ma'am. Is it because of me that everyone is having 9 to 10 patients now." SUMF ¶ 31. This question is consistent with the Defendant's policy change during January 2007 to take some NCAs off the hospital floor and increase the patient load for the remaining NCAs. Plaintiff alleges Scott responded: "Yes. Don't you know you are too old to be working?" SUMF ¶ 32; Pl.'s Resp. to SUMF at 11.[8] Scott allegedly then told Plaintiff he could continue working for two weeks. SUMF ¶ 33. Plaintiff requested four, rather than two, additional weeks of work, and Scott agreed. Id. ¶ 34. Plaintiff testified that he

_____

[7] Plaintiff is not completely clear or consistent regarding when Scott allegedly made her statement about him being "too old" to work. Plaintiff stated during his deposition that he believes the statement was made in mid-January 2007. Pl.'s Dep. at 27; see also Pl.'s Resp. to SUMF ¶ 28. At other times, Plaintiff insinuates Scott made the statement during her discussions with him regarding her decision to terminate him, which took place on February 1, 2007. See Pl.'s Resp. to Scott Decl. at 7. Since Scott denies making the statement, the Court has no other source of evidence regarding when it might have occurred other than Plaintiff's descriptions. The Court must construe Plaintiff's factual allegations in his favor, Vinyard v. Wilson, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002), and accordingly the Court assumes for these purposes that Scott told Plaintiff he was "too old" to work in January 2007, before she decided to terminate him.

[8] Scott denies telling Plaintiff he was "too old" to continue working. SUMF ¶ 50.

believes Scott is a "good lady," and that she decided to terminate him at the direction of the secret society. Pl.'s Dep. at 48.[9]

Over the next several weeks following the January 4th meeting, Scott continued to receive complaints about Plaintiff's slow pace of work and attitude towards other staff members. SUMF ¶ 27. Scott determined to terminate Plaintiff's employment effective February 21, 2007. SUMF ¶ 28. Scott documented in a counseling report, dated February 1, 2007, the ongoing problems with Plaintiff and her decision to terminate him. Id. ¶ 29; Scott Decl. Exh. 2. Scott stated she discussed this counseling report and her decision to terminate Plaintiff with him on February 1, and that Plaintiff became very upset during the meeting and asked to be allowed to continue working until he found another job. Scott refused this request, and Plaintiff refused to sign the counseling report. SUMF ¶ 30.[10]

_____

[9] Plaintiff disputes that his deposition testimony was mistakenly transcribed. This dispute is not supported by the evidence.

[10] Plaintiff objects that the February 1, 2007 counseling report is fake and that he did not meet with Scott on February 1, 2007. Pl.'s Resp. to SUMF at 11. The basis for Plaintiff's objection is his work schedule, which he alleges proves that he did not work on February 1, 2007. Pl.'s Exh. 80. Plaintiff's Exhibit 80 is a handwritten work schedule for February 2007, and it shows that Plaintiff was not scheduled to work on January 31 or February 1. Cobb Hospital's computerized

On February 15, 2007, Plaintiff visited the offices of the Equal Employment Division of the Georgia Commission on Equal Opportunity and obtained the paperwork to file an employment complaint. Pl.'s Resp. to SUMF at 14. Plaintiff notarized an age discrimination complaint on February 17, 2007, and submitted it on February 26, 2007. Pl.'s Exh. 11. On March 1, 2007, the Georgia Commission on Equal Opportunity dismissed Plaintiff's complaint because Defendant is not an agency of the State of Georgia. Pl.'s Exh. 19.

Plaintiff alleges his Georgia equal employment complaint was referred to the United States Equal Employment Opportunity Commission (the "EEOC"). On June 8, 2007, Plaintiff received a notice of right to sue from the EEOC.

_____

time records, however, show that Plaintiff in fact worked from approximately 7:00 p.m. on January 31, 2007 to 7:40 a.m. on February 1, 2007. Stanfield Decl. Exh. A. Plaintiff believes this document is false. Pl.'s Notice of Filing to Prevent New False Exhibit [79]. The Court is not empowered on summary judgment to assess the credibility of evidence or choose between competing versions of facts. The exact date Plaintiff was presented with this counseling report is not a fact material to this dispute. Plaintiff does not dispute that Scott created the counseling report and used it to document her concerns about his work performance and her decision to terminate his employment. Plaintiff also does not dispute that he received the counseling report and refused to sign it. Plaintiff merely disputes the date on which the report was filed. The material dispute in this action is whether Defendant terminated Plaintiff for reasons other than age discrimination. The counseling report is material evidence indicating Defendant's motivations in making its decision to terminate Plaintiff.

On February 26, 2007, Plaintiff met with Scott to discuss the circumstances of his termination. Plaintiff also sought what he termed a "separation letter" explaining the reasons for his termination. Pl.'s Dep. at 93-95. Scott allegedly asked him to return later to receive written documentation of his termination. Id.

On February 27, 2007, Plaintiff again came to the hospital to meet with Scott. He came to deliver a letter to her he had written memorializing his meeting with her the previous day. Upon arriving at the hospital, Plaintiff was met by Scott, who told him that she had telephoned him and left a message on his answering machine explaining that she had decided to reinstate him as an employee. Pl.'s Dep. at 98. Scott reinstated Plaintiff and placed him on the work calendar with morning shifts beginning at 7:00 a.m. on February 28, March 1, and March 2, 2007. SUMF ¶¶ 52, 55-56. The next morning, on February 28, 2007, Plaintiff gave Scott a copy of the letter he had planned to give to her the previous day. Pl.'s Resp. to SUMF ¶ 47. Plaintiff's letter alleges, among other things, that Scott told him in mid-January that he was "too old" to continue working. Pl.'s

Exh. 12.  This letter was the first time Scott had learned that Plaintiff alleged or complained about age discrimination.  SUMF ¶ 49.[11]

Scott met with Plaintiff after his shift on February 28, 2007.  She gave him a Counseling Report and Action Plan, dated the previous day (the "Counseling Report").  Scott Decl. Exh. 3; SUMF ¶ 43.  The Counseling Report lists four specific areas in which Plaintiff could improve his performance, including better following instructions from supervisors and better documentation of patient vital signs.  Id.; SUMF ¶ 44.  Plaintiff refused to sign the document, but admits that he received it.  SUMF ¶ 45; Pl.'s Resp. to SUMF ¶ 45.  Plaintiff contends the Counseling Report he was given began to cause a series of health problems related to anxiety over his employment.  Pl.'s Resp. to SUMF ¶ 46.

---

[11]  Plaintiff's disagreement with this statement is not supported by the evidence.  Plaintiff argues that the Georgia Equal Employment Opportunity office, Scott's assistant, or James Harris, or the director of human resources at Cobb Hospital to whom Plaintiff had delivered a copy of the letter on February 27, could have notified Scott of Plaintiff's age discrimination complaints before she decided to reinstate him.  See Pl.'s Resp. to SUMF ¶ 51.  This argument is not supported with evidence.  It simply is a theory about how Scott could or should have been informed by others of Plaintiff's age discrimination complaint.  It is undisputed that Scott informed Plaintiff that she had reconsidered her decision to terminate him either before or contemporaneously with receiving his letter charging age discrimination.

On March 5, 2007, Scott received a written complaint from Nurse Paula Ducasse about Plaintiff's conduct toward her when they worked together on the February 28, 2007 day shift. SUMF ¶ 52; Scott Decl. Exh. 4. Ducasse complained that Plaintiff had screamed at her during the shift, and she asked not to be partnered with Plaintiff in the future. SUMF ¶¶ 52-53.[12]

Before the March 5 complaint regarding his work was received, Plaintiff cancelled his scheduled shifts on March 1 and March 2. SUMF ¶¶ 55-56. Plaintiff's stated reason for cancelling his shift assignments was poor health. Pl.'s Resp. to SUMF ¶¶ 55-56. On March 3, Plaintiff traveled to the hospital to pick up his paycheck. While there he met with Scott and requested at least two weeks off of work because he was ill. SUMF ¶¶ 57-58; Pl.'s Resp. to SUMF ¶¶ 57-58. Scott informed Plaintiff he would need to provide documentation from his doctor to be out of work for that length of time. SUMF ¶ 59; Pl.'s Resp. to SUMF ¶ 59.

_____

[12] Plaintiff asserts Ducasse is not being truthful and that her written complaint is a false document. Pl.'s Resp. to SUMF ¶¶ 52-54. Plaintiff apparently believes the six-day lag between February 28 and the date on which Ducasse wrote the complaint evidences that it is false. Plaintiff does not support his arguments with citations to evidence in the record, and the Court's review of the evidence confirms that nothing casts doubt on the complaint's veracity. It is essentially undisputed that Ms. Ducasse wrote the complaint and delivered it to Scott by March 5, 2007.

After speaking with Plaintiff, Scott contacted Pam Jackson in Defendant's Human Resources department, who informed her that Plaintiff was not eligible for a leave of absence under Defendant's leave policy and that he would need to provide a doctor's note to take two weeks off work. SUMF ¶ 60. On March 5, 2007, Jackson telephoned Plaintiff, in Scott's presence, to explain Defendant's leave policy and to advise Plaintiff he needed to provide a doctor's note explaining his illness to support his request for time off. SUMF ¶ 63; Pl.'s Resp. to SUMF ¶ 63. Jackson allegedly gave Plaintiff until March 9, 2007 to either show up to work or to produce a doctor's note. Pl.'s Resp. to SUMF ¶ 63.[13]

Plaintiff did not produce a doctor's note, and he did not return to work. SUMF ¶ 65. On March 14, 2007, Scott prepared internal paperwork to document that Plaintiff was terminated for failure to return to work. SUMF ¶ 65; Scott Decl. ¶ 15.

---

[13] Plaintiff argues he was prevented from signing up for a doctor through Defendant's health insurance policy because of a variety of personnel records problems he experienced early in his employment. Pl.'s Resp. to SUMF ¶ 59. Plaintiff does not dispute that he was instructed by Defendant's personnel to either show up to work or produce a note from his doctor explaining his illness. Plaintiff also argues that he expected for the Human Resources department to set up an appointment for him to meet with doctors at Cobb Hospital. Pl.'s Resp. to SUMF ¶ 65. No evidence in the record suggests that the Human Resources department told Plaintiff they would arrange for his doctor's visits.

On August 21, 2007, Plaintiff filed this action pro se. Construed liberally, Plaintiff's complaint alleges claims for age discrimination related to his termination from employment with Defendant and retaliation related to the age discrimination complaints he filed in February 2007 [1].[14]

On April 24, 2008, the Defendant moved for summary judgment [62]. Defendant argues summary judgment is appropriate because Plaintiff failed to make a *prima facie* case of discrimination or retaliation or, alternatively, that Plaintiff failed to adequately rebut the Defendant's proffered nondiscriminatory reason for terminating him.

## II.   DISCUSSION

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the

---

[14] The parties became embroiled in a protracted discovery dispute. On February 11, 2008, the Court held a hearing on pending discovery motions and granted Defendant's motions to compel and for extensions of time [44].

-15-

moving party has met this burden, the non-movant must demonstrate that summary

judgment is inappropriate by designating specific facts showing a genuine issue for

trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

The non-moving party "need not present evidence in a form necessary for

admission at trial; however, he may not merely rest on his pleadings." Id.

 "At the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). Where the record tells two

different stories, one blatantly contradicted by the evidence, the Court is not

required to adopt that version of the facts when ruling on summary judgment. Id.

"[C]redibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at

1282. "If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party

opposing summary judgment, "'must do more than simply show that there is some

metaphysical doubt as to the material facts . . . . Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial.'" Scott, 127 S. Ct. at 1776 (quoting Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled
to summary judgment if "the facts and inferences point overwhelmingly in favor of
the moving party, such that reasonable people could not arrive at a contrary
verdict."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir.
2002) (internal quotations omitted).

### A.    Age Discrimination Claim

#### 1.    Governing Law

The Age Discrimination in Employment Act ("ADEA") makes it unlawful
for an employer to "fail or refuse to hire or to discharge any individual or
otherwise discriminate against any individual with respect to his compensation,
terms, conditions, or privileges of employment, because of such individual's age."
29 U.S.C. § 623(a)(1).  The plaintiff bears the burden of showing discrimination.
Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004).  A plaintiff
can satisfy this burden by showing either direct or circumstantial evidence of
discrimination.  Where the plaintiff cannot present direct evidence of
discrimination, the plaintiff can still prevail by showing circumstantial evidence of

discrimination sufficient to pass the burden-shifting test established in <u>McDonnell</u>

<u>Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[15]

Under the <u>McDonnell Douglas</u> framework, a plaintiff alleging age

discrimination must first present sufficient circumstantial evidence to establish a

*prima facie* case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. To

establish a *prima facie* case of age discrimination, the plaintiff must show that he

(1) is member of the protected class of persons aged 40 to 70; (2) was qualified for

the employment position at issue; (3) suffered an adverse employment action; and

(4) either was replaced by a person outside his protected class, or was treated less

favorably than a similarly-situated individual outside his protected class. <u>Brillinger</u>

<u>v. City of Lake Worth</u>, No. 08-10020, 2008 WL 3864383, at *3 (11th Cir. Aug. 21,

2008); <u>Burke-Fowler v. Orange County, Fla.</u>, 447 F.3d 1319, 1323 (11th Cir.

2006). "An adverse employment action must effect a serious and material change

in the terms, conditions, or privileges of employment." <u>Osahar v. Postmaster</u>

<u>General of the United States Postal Service</u>, 263 Fed. App'x 753, 761 (11th Cir.

2008) (internal citations omitted).

---

[15] Although normally utilized in the context of discrimination under Title VII, the <u>McDonnell Douglas</u> framework also applies to ADEA claims. <u>O'Connor v. Consol. Coin Caterers Corp.</u>, 517 U.S. 308 (1996).

If the plaintiff shows a *prima facie* case of discrimination, then a presumption of discrimination arises, and the burden shifts to the defendant to rebut the presumption by producing legitimate nondiscriminatory reasons for the adverse employment action. Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999), cert. denied, 528 U.S. 966 (1999). The employer's burden to articulate a non-discriminatory reason is a burden of production, not persuasion. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).

By producing legitimate nondiscriminatory reasons for its actions, an employer dispels the inference of discrimination, and the burden then returns to the plaintiff to show that the defendant's proffered reason was merely a pretext for discriminatory intent. Burdine, 450 U.S. at 253; Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997). "The inquiry into pretext requires us 'in view of all the evidence, [to] determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" Osahar, 263 Fed. App'x at 762 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). To show pretext, a

plaintiff must establish both that the defendant's proffered legitimate reason was false and that discrimination was the real reason for the adverse action. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515 (1993); <u>Silvera v. Orange County School Board</u>, 244 F.3d 1253, 1261 (11th Cir. 2001).

"In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Jackson v. State of Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted). The Court should not, absent evidence of discrimination, overrule an employer's legitimate business judgments concerning hiring and personnel. <u>EEOC v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171, 1176 (11th Cir. 2000).

## 2.   Analysis

Defendant argues Plaintiff has not shown a *prima facie* case of discrimination and, even if he had, has not shown that Defendant's nondiscriminatory reason for terminating Plaintiff was a pretext for discrimination. The Court agrees.

The Court must evaluate Plaintiff's discrimination claims using the McDonnell-Douglas framework because Plaintiff has not shown any direct evidence of discrimination. Direct evidence is "evidence, that, if believed, proves the existence of a fact without inference or presumption." Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (internal quotation marks omitted). Evidence that only suggests discrimination or that is subject to more than one interpretation is not direct evidence. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997). "In an age discrimination context, the quintessential example of direct evidence would be a management memorandum saying, 'Fire Earley – he is too old.'" Roberts v. Design & Mfg. Servs., Inc., 167 Fed. App'x 82, 85 (11th Cir. 2006) (internal citations and quotation marks omitted).

The only actual evidence of age discrimination in this action is Scott's alleged statement that Plaintiff was "too old" to work. Under Eleventh Circuit precedent, this is not direct evidence of discrimination. In Roberts v. Design & Mfg. Servs., the Eleventh Circuit found statements that the plaintiff was "getting to old for this stuff," and "needed to spend more time with [his] family and get back to playing golf," were not direct evidence of discrimination because the factfinder would have been required to infer from those statements that the plaintiff was fired

because of his age, and not for some other legitimate reason.  Roberts, 167 Fed.

App'x at 84-85.  This case presents essentially the same situation.  Scott's single

alleged statement that Plaintiff was "too old" to work when he raised a question

about the increase in patients for all NCAs is circumstantial evidence because it

requires the factfinder to infer that Scott's belief that Plaintiff was too old caused

Scott to terminate him.  Because of this inference, the Court must use the burden-

shifting framework in McDonnell-Douglas.

### a.    Prima Facie Case

Plaintiff fails to show a prima facie case of discrimination because he has

not presented any evidence that he was replaced by a younger person or that he

otherwise was treated less-favorably than younger employees.[16]  Eleventh Circuit

precedent requires a plaintiff to show that he was treated differently from younger

employees.  Austin v. Progressive RSC, Inc., 265 Fed. App'x 836, 845 (11th Cir.

2008) (granting summary judgment for defendant because plaintiff failed to

establish a prima facie case by failing to demonstrate more-favorable treatment to

employees not within plaintiff's protected class); Brillinger, 2008 WL 3864383, at

---

[16]  The Defendant effectively concedes Plaintiff was a member of a protected class and was qualified for a NCA position.

*3; see also Taylor v. Texaco, Inc., 510 F. Supp. 2d 1255, 1270-71 (N.D. Ga. 2007). Plaintiff has not presented any evidence that he was replaced by anyone or that younger employees received more-favorable treatment. It is also undisputed that Scott supervised several other employees within Plaintiff's protected class, and that Scott herself was nearly 50 years old at the time of Plaintiff's termination. Without this evidence, the Court cannot infer that Plaintiff was mistreated because of his age, when the evidence in the record shows that other individuals within Plaintiff's protected class were not similarly mistreated. Plaintiff has not met this element of the prima facie case, and the Defendant is entitled to summary judgment on Plaintiff's discrimination claim on this ground alone.[17]

---

[17] The Defendant also argues Plaintiff failed to show that he was subject to an adverse employment action, another element of the *prima facie* case. Def.'s Mot. for Summ. J. at 6-7. The Defendant argues that since Plaintiff's initial termination was rescinded, it cannot be the basis of an adverse employment action. Defendant further argues that Plaintiff's final termination should not be considered an adverse employment action because Plaintiff's employment ended because he stopped coming to work. This argument is misdirected. Plaintiff clearly was subject to an adverse employment action when he was terminated the second time. What is disputed, and what is the reason for this litigation, is whether that termination was based on age discrimination or retaliation, or was instead based on the Defendant's proffered nondiscriminatory reason that Plaintiff stopped coming to work. For the purposes of assessing the *prima facie* case, however, the Court looks only to whether an adverse action occurred, not why it occurred.

### b. Pretext

The Defendant also argues that even if Plaintiff could show a prima facie case of discrimination, he cannot raise a genuine issue of material fact that the Defendant's proffered nondiscriminatory reason for terminating him was pretextual.

The Defendant argues it terminated Plaintiff because he chose not to come to work after his initial termination was rescinded. Plaintiff's allegations of fact establish that he came to work on February 28, 2007, called off his next two scheduled shifts on March 1 and March 2, 2007, and requested, when he came to the hospital to pick up his paycheck on March 3, 2007, an additional two weeks off for medical reasons. Scott informed Plaintiff that he would need a letter from his doctor explaining the medical condition and that without the note he would be terminated. On March 5, 2007, Pam Jackson, Director of Human Resources for Defendant, telephoned Plaintiff and again explained that if he did not produce a doctor's note or return to work by March 9, 2007, he would be terminated. Plaintiff did not comply with these conditions. On March 14, 2007, Scott prepared internal paperwork to document Plaintiff's termination.

To show pretext, Plaintiff must show evidence that the real reason for his termination was age discrimination, not the reason relied on by the Defendant. Put another way, the Plaintiff must show that the Defendant's proffered reason was false. The record establishes that Scott began seeing performance deficiencies in Plaintiff's employment soon after he was hired. Scott first documented these concerns on January 4, 2007, and she met with Plaintiff to discuss these concerns, which included giving Plaintiff the opportunity to explain and correct his performance deficiencies. Scott allegedly continued to receive complaints about Plaintiff's work performance and attitude, and she made a decision on or around February 1, 2007 to terminate Plaintiff based on these performance deficiencies. This was documented in a counseling report discussed with Plaintiff by Scott on the same day. Plaintiff continued to work until February 21, 2007. Approximately one week later, Scott reconsidered her initial decision and reinstated Plaintiff. When Plaintiff returned to work, he worked one shift, immediately took ill, and sought two weeks of sick leave. Scott advised Plaintiff that he could take this leave only if his illness was verified by a doctor's note. Defendant's human resources department confirmed that a doctor's note was required. Plaintiff did not

provide the required documentation, and he did not return to work. Scott terminated Plaintiff's employment the following week.

The only evidence supporting Plaintiff's theory that Defendant terminated him for age discrimination is Scott's single statement, in response to Plaintiff's question concerning the increase in patient loads for all NCAs, that Plaintiff was too old to work. Plaintiff does not present any other evidence that the Defendant's legitimate reason for terminating him was false. Defendant, like many employers, apparently has a policy to allow extended sick leave only if a doctor confirms the need for leave. The Court is not permitted to second-guess that policy or adjudge whether it should have been applied to Plaintiff in this situation. Defendant was entitled to terminate Plaintiff's employment as long as it was for a reason other than discrimination or retaliation based on Plaintiff's membership in a protected class. The Court finds that in light of the evidence presented in this case, no reasonable jury could disbelieve the Defendant's legitimate reason for terminating Plaintiff.

In sum, Plaintiff's claim for age discrimination must fail as an initial matter because he has not presented sufficient evidence to support a *prima facie* case of discrimination. Even if he had, the Defendant produced a legitimate

nondiscriminatory reason for Plaintiff's termination.  Plaintiff has not identified

any evidence, other than his own unsupported arguments, sufficient to raise a

genuine issue of material fact that the Defendant's proffered nondiscriminatory

reason was false and pretextual.

### B. Retaliation Claim

#### 1. Governing Law

Similar to charges of discrimination under the ADEA, a plaintiff alleging

retaliation must first show a *prima facie* case of retaliation.  A plaintiff must show

that (1) he engaged in statutorily-protected activity; (2) he suffered an adverse

employment action; and (3) the adverse employment action was causally related to

the plaintiff's exercise of a protected activity.  Goldsmith v. Bagby Elevator Co.,

Inc., 513 F.3d 1261, 1277 (11th Cir. 2008).  "After the plaintiff has established the

elements of a claim, the employer has an opportunity to articulate a legitimate,

non-retaliatory reason for the challenged employment action as an affirmative

defense to liability."  Id. (citing Coutu v. Martin County Board of County

Comm'rs, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995)).  "If the defendant

offers legitimate reasons, the presumption of retaliation disappears.  The plaintiff

must then show that the employer's proffered reasons for taking the adverse action

were actually a pretext for prohibited retaliatory conduct." Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 n.6 (11th Cir. 2000) (internal quotation marks omitted).

The scope of "adverse employment actions" in the anti-retaliation context is broader than in the context of an age discrimination claim. Because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006), "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. Adverse employment actions in the anti-retaliation context are those which might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 68; Stone v. Geico Gen. Ins. Co., No. 06-15470, 2008 WL 2191777, at *2 (11th Cir. May 28, 2008).

As for the "causal element" link between the plaintiff's exercise of a protected activity and the adverse employment actions, the Eleventh Circuit has construed the link element broadly, "so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely

unrelated." <u>Goldsmith</u>, 513 F.3d at 1278 (internal quotation marks omitted). A plaintiff must show knowledge of the protected activity by his employer and a close temporal proximity between the protected activity and the adverse employment action. <u>Higdon v. Jackson</u>, 393 F.3d 1211, 1220 (11th Cir. 2004).

### 2. Analysis

Plaintiff alleges three instances of essentially the same protected activity: (1) that he filed an age discrimination charge with Georgia's Equal Opportunity Commission; (2) that his Georgia age discrimination charge was later transferred to a federal EEOC complaint; and (3) that he complained of age discrimination directly to his supervisors at Cobb Hospital, including Scott. Plaintiff claims he was either terminated (a second time) in response to these charges or that his transfer to the day shift was retaliatory.

Plaintiff has not shown a genuine issue of fact as to whether his state and federal equal employment complaints were the basis for adverse actions taken against him. A plaintiff claiming retaliation must show knowledge of the protected activity by his employer. <u>Higdon</u>, 393 F.3d at 1220. Plaintiff argues Scott, or others employed by the Defendant, "could" or "should" have been contacted by state or federal officials regarding his complaints, but he does not present any

evidence that Defendant had any reason to know about the complaints. Indeed, the only record evidence shows otherwise: Scott stated in her declaration that she became aware of Plaintiff's age discrimination complaints only when he delivered his February 26, 2007 letter to her on February 28. Scott Decl. ¶ 10. Scott confirmed in her deposition testimony that she first received Plaintiff's letter on February 28, 2007. Scott Dep. at 24-25; see also Scott Dep. Exh. 1 (Plaintiff's February 26, 2007 letter with handwritten notation showing it was "received 2/28/07 @ 12N"). Plaintiff has not presented any evidence that anyone else employed with the Defendant had any knowledge of either his state or federal EEOC complaints. Absent evidence of this knowledge, Plaintiff cannot show retaliation based on those complaints.

Plaintiff's complaints to the Defendant about purported age discrimination also would constitute a protected activity for which Plaintiff could claim retaliation. Whether Plaintiff has shown a genuine dispute of fact over his internal complaints presents a closer question. The Court carefully considers the timeline of events.

Plaintiff met with Scott on February 26, 2007 to discuss the circumstances of his initial termination. He does not contend that he discussed Scott's alleged

discriminatory statement that Plaintiff was "too old to work" at that meeting. Sometime immediately after that meeting, Plaintiff memorialized the discussions in a letter to Scott. The letter includes a purported statement by Scott to Plaintiff that he was "too old" to continue working and should be on retirement. See, e.g., Scott Dep. Exh. 1. On February 27, 2007, Plaintiff contends he delivered a copy of the letter to James Harris at the Defendant's Human Resources Department. Pl.'s Resp. to SUMF ¶ 47. Plaintiff then immediately walked across the hospital to deliver the original of the letter to Scott. Id. He was interrupted on his way by Scott, who immediately told him that she had reconsidered her decision to terminate him and was moving him to the day shift. Id.; Scott Dep. at 17. Scott and Plaintiff went to a Resource Room, and Scott wrote "7A" by hand on the work schedule for February 28, March 1, and March 2, meaning that Plaintiff was to work beginning at 7:00 a.m. on those dates. Id. On the following morning, when Plaintiff reported to work, he first gave Scott a copy of his February 26, 2007 letter.

Plaintiff now alleges the shift change from the night shift to the day shift was retaliatory. The Court assumes for the purpose of this discussion that moving an employee from the night shift to the day shift can be an "adverse employment

action" within the meaning of a retaliation claim.[18]  To show retaliation, the

Plaintiff must present evidence that the Defendant knew of his protected actions

and that there was a causal relationship between the protected actions and the shift

change.  The Court concludes Plaintiff has not made this showing.

Scott reinstated Plaintiff and changed his shift to the day shift on February

27, 2007.  It is undisputed that Scott did not receive a copy of Plaintiff's letter until

the following morning, after Plaintiff already had reported to work at his new shift.

Because Scott did not know of Plaintiff's age discrimination complaints, it is not

possible for Scott to have made her decision to reassign Plaintiff to a different shift

because of Plaintiff's complaints.  Plaintiff further alleges that someone from the

human resources department might have contacted Scott between the time when

Plaintiff delivered a copy of his letter to Harris and when he saw Scott after

walking across the hospital.  Pl.'s Resp. to SUMF ¶ 47.  Plaintiff does not present

---

[18]  Adverse employment actions in the retaliation context are those which might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Burlington, 548 U.S. at 68.  "[A] transfer to a less desirable position in terms of pay or eligibility for pay increases is an adverse employment action because it is equivalent to a demotion."  Akins v. Fulton County, Ga., 420 F.3d 1293, 1301 (11th Cir. 2005), cert. denied, 546 U.S. 1095 (2006).  Plaintiff asserts that he did not wish to work on the day shift and that night shift workers earned more per hour.

any evidence to support this argument.  The only evidence of Scott's knowledge is her declaration, which states that she learned for the first time that Plaintiff had complained of age discrimination on the morning of February 28.  Scott Decl. ¶ 10. Plaintiff has not provided any evidence to support his claim that Scott knew, before February 28, 2007, that Plaintiff was claiming age discrimination.[19]  The only evidence in the record is that Scott decided on Plaintiff's shift change before she knew Plaintiff had made a charge of discrimination, and the shift change therefore cannot be the basis for a retaliation claim.[20]

Plaintiff also asserts that his second termination was in retaliation for his age discrimination complaints.  As discussed fully above, Defendant had a reasonable non-retaliatory reason to terminate Plaintiff in March 2007: he did not return to work after February 28.  Plaintiff has not presented any evidence that this legitimate reason was false or a pretext for retaliation.  Although the parties quibble over whether Plaintiff should have been required to account for his sick

---

[19]  Plaintiff did not depose Mr. Harris, for instance.

[20]  Even if there were a causal connection between the shift change and Plaintiff's complaints, Defendant also has asserted a reasonable non-retaliatory reason to change Plaintiff's shift: that Scott wanted to be able to supervise him more closely.  Scott Decl. ¶ 8.  Plaintiff has not shown that this reasonable non-retaliatory reason was pretext for retaliation.

leave with a doctor's note, it is essentially undisputed that Plaintiff was given the opportunity to come back to work by March 9, 2007. He did not do this, and Defendant terminated him the following week. Nothing in the record suggests this reason was a pretext to retaliate against Plaintiff.

Plaintiff accordingly has not shown a genuine dispute of material fact regarding his retaliation claim. Because he has not shown sufficient evidence of retaliation, or otherwise failed to rebut the Defendant's proffered legitimate non-retaliatory reasons for its actions, Plaintiff's retaliation claims are required to be dismissed.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Wellstar Health System, Inc.'s Motion for Summary Judgment [62] is **GRANTED**.

**SO ORDERED** this 23rd day of September 2008.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE